UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CRIMINAL ACTION NO. 3:15-CR-00044-6-TBR

UNITED STATES OF AMERICA,                                                    PLAINTIFF

v.

DARRYLE COOPER, *et. al*,                                                    DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Gary Ross's Motion to Suppress and Supplement to his Motion to Suppress. [DN 148; DN 160.] The United States responded, [DN 165], and Ross did not reply. The Court held a suppression hearing on February 2, 2017, at which it heard testimony from Sergeant Steve Bailey, Officer Sean Szpila, Ross's girlfriend, Akia Ellis, and Defendant Ross. [DN 166; DN 167.] The parties filed simultaneous post-hearing briefs, [DN 170; DN 171], and Ross filed a response, [DN 178.] Fully briefed, Ross's motion is ripe for adjudication. For the following reasons, Ross's Motion to Suppress [DN 148] is **DENIED**.

## BACKGROUND

On the night of October 28, 2014 at approximately 9:15 p.m., Sergeant Steve Bailey of the Louisville Metro Police Department (LMPD)[1] was dispatched to a house on Southdale Road in Louisville, Kentucky to respond to a panic alarm that was set off at the residence. [DN 167 at 5 (Evidentiary Hearing Transcript).] Sergeant Bailey testified that he arrived at the house by 9:18 p.m., about three minutes later. [*Id.* at 6.] After Sergeant Bailey exited his vehicle and approached the house, he observed the silhouette of a person through the glass on the front door. [*Id.* at 7–8.] The person, who was the Defendant, Gary Ross, stepped out of the front door to

---

[1] Sergeant Bailey was employed with LMPD on October 28, 2014, but at the time of the evidentiary hearing, he was employed by the Prospect Police Department. [DN 167 at 3–4.]

1

stand on the porch. [*Id.* at 7.] As Sergeant Bailey walked toward the porch, Ross informed him that he had tried to call dispatch to cancel any police response to the panic alarm, and Sergeant Bailey testified that Ross did this in a "suspicious and kind of nervous" way that indicated "he didn't want police presence at that particular time." [*Id.*] Sergeant Bailey explained that, while in his experience homeowners are typically grateful when police respond to alarms, Ross acted "very defensive," stood in close proximity to his front door, and "was kind of mad . . . or disgusted with dispatch" for failing to cancel the police response. [*Id.* at 9.] Sergeant Bailey testified that immediately upon speaking with Ross, he could "smell a strong fresh odor of marijuana emitting from within the residence." [*Id.* at 12.] Sergeant Bailey testified that he had encountered this smell on numerous occasions throughout his twenty-three years as a police officer, and that after working in narcotics, he can discern a difference between the smell of burnt or recently smoked marijuana and fresh marijuana. [*Id.* at 14.]

To verify that Ross did, in fact, live at the residence on Southdale Road, Sergeant Bailey asked Ross for identification, which Ross provided. [*Id.* at 13; 16; 46.] During this initial encounter, the door to Ross's house was slightly open, and at one point Sergeant Bailey observed Ross's girlfriend, Akia Ellis, in the house with a young child. [*Id.* at 15.] Although Ross informed Sergeant Bailey that his son accidentally set off the home alarm, Sergeant Bailey testified that the alarm coupled with Ross's defensiveness made him concerned about the possibility of a domestic disturbance or a home invasion. [*Id.* at 16.] Sergeant Bailey testified that Ross started to become more "belligerent," and he began to suspect that illegal activity was going on. [*Id.*] At this point, Office Bailey asked Ross for his consent to search his home. [*Id.*] In response, Sergeant Bailey testified that Ross became more belligerent, possibly as "a distractionary technique." [*Id.* at 17.] Sergeant Bailey further testified that Ross admitted that he

had recently smoked marijuana and that he stated that he was in a rush to leave his house. [*Id.*] Ross turned to Ellis and told her to shut the door and not to let Sergeant Bailey in. [*Id.*] In response, Sergeant Bailey instructed Ellis "[d]on't shut that door." [*Id.*]

After this exchange, Sergeant Bailey called for backup, and while he waited for another officer to arrive, he placed Ross in handcuffs "for mine and [his] safety," though he did not place Ross under arrest. [*Id.*] Ross remained in handcuffs until police left his residence at approximately 4:45 a.m. the next morning. [*Id.* at 49.] Officer Sean Szpila arrived at the house shortly thereafter and observed that Ross "seemed agitated" and "was not calm" when he arrived. [*Id.* at 49; 65–67.] However, both officers testified that Ross seemed to interact more calmly with Officer Szpila than he did with Sergeant Bailey and that the two developed a "bit of a rapport." [*Id.* at 19; 67–68.] Officer Szpila also testified that he could smell marijuana from outside the house. [*Id.* at 68; 71.] The officers both testified that, shortly after Officer Szpila arrived and began talking with Ross, he admitted to them "that he had a little bit of marijuana inside the residence" and gave Officer Szpila permission to go into the house to seize the marijuana. [*Id.* at 19–20; 68; 72.] When Officer Szpila went into the house, he observed a small amount of marijuana, some money, and a stack of loose leaf paper in the kitchen. [*Id.* at 68–69.] Officer Szpila also saw Ellis and her young son. [*Id.* at 68.] He then went back out onto the porch and told Sergeant Bailey what he saw. [*Id.* at 23; 69.]

Sergeant Bailey and Officer Szpila then took Ross inside the house, and while Officer Szpila remained with Ross and Ellis, Sergeant Bailey conducted a "protective sweep of the house to make sure there w[ere] no other suspects present within." [*Id.* at 23; 70.] After the sweep concluded, Officer Szpila and a third officer who arrived on the scene, Officer Jones, stayed with Ross and Ellis in the living room while Sergeant Bailey gathered information he would need to

apply for a search warrant of the home. [*Id.* at 28.] Sergeant Bailey then left to type up the warrant affidavit and present the application to a state court judge, who granted and signed the warrant at approximately 1:40 a.m. on October 29, 2014. [*Id.* at 28; 49.]

After Sergeant Bailey arrived back at Ross's house, the officers took Ellis's information and allowed her to leave with her young son. [*Id.* at 29.] Then, Sergeant Bailey and the rest of his five-person unit, which had since arrived at the residence, executed the search warrant and performed a detailed search of the house. [*Id.*] The officers found various evidence during their search, the most significant of which was large sums of money located at the bottom of a laundry basket in the master bedroom, including three $30,000 stacks and one $55,000 stack of cash. [*Id.* at 29–32.]

While the officers searched and filled out a log sheet documenting the evidence they found during their search, Sergeant Bailey and Ross began talking "in an interview-type forum." [*Id.* at 33.] Sergeant Bailey testified that he read Ross his *Miranda* rights and that Ross "agreed. He waived his rights and agreed to speak with me." [*Id.* at 33–34.] However, Sergeant Bailey did not obtain a written *Miranda* waiver. [*Id.* at 51–53.] Sergeant Bailey testified that the two began to talk in more detail about the case, and that Ross responded to him more positively than he had during their initial encounter. [*Id.* at 34–35.] However, neither Ross nor the United States have identified for the Court any statements Ross made after waiving his *Miranda* rights.

Ross and Ellis, who also testified at the evidentiary hearing, told the story with some key differences. First, Ellis testified that their two-year-old son set off the alarm to their house when playing with the alarm key fob on Ross's keys. [*Id.* at 80; 92.] When the alarm system went off, Ellis stated that she put in the correct code to stop it. [*Id.* at 80.] When the alarm company called Ross, he explained that their son had accidentally set the alarm off and provided the proper

passcode. [*Id.*] Ellis estimated that it was approximately twenty to thirty minutes later when Sergeant Bailey arrived at the house. [*Id.* at 80–81.] On cross-examination, defense counsel questioned Sergeant Bailey regarding an incident report pertaining to these events that states "alarm company advises false alarm; did speak to homeowner that provided proper passcode." [*Id.* at 42–43.] Ross and Ellis testified that they explained this to Sergeant Bailey, [*id.* at 90–94], however, Sergeant Bailey testified that he never received word from dispatch to disregard the panic alarm. [*Id.* at 27–28.] Rather, Sergeant Bailey explained that he believed that incident report was generated from the police dispatch center, "[b]ut chronologically speaking, there's information on there . . . that's not relayed to me as the officer on scene." [*Id.* at 57.] Accordingly, Sergeant Bailey was hesitant to take Ross's word for it that the alarm was an accident. [*Id.* at 61.]

Second, both Ross and Ellis testified that it was Officer Szpila, "[t]he uniformed officer," rather than Sergeant Bailey, who performed the sweep of their home. [*Id.* at 82–83; 95.] They testified that after Officer Szpila performed this sweep, he came back out, told Sergeant Bailey that "everything [wa]s clear," and that is when the officers took Ross and Ellis inside and sat them on the couch in the living room. [*Id.* at 83; 95.] Shortly thereafter, the officers allowed Ellis to leave with their son. [*Id.* at 83.]

Third, Ross and Ellis both testified that after Ross told Ellis to shut the door, she attempted to do so but Sergeant Bailey placed his foot in the doorway to prevent this from happening. [*Id.* at 81–82; 94–95.] When defense counsel asked Sergeant Bailey whether he placed his foot in the door, he stated "I don't recall, but I may have, obviously to keep her from shutting the door on us." [*Id.* at 47.] When asked again whether he may have done this "so that

the homeowner cannot close the door to keep police out," Sergeant Bailey again replied "Yes." [*Id.*]

Fourth, Ross and Ellis both testified that at no time did Ross ever give either officer any consent to enter his residence. [*Id.* at 85; 95–97.] On cross-examination of Sergeant Bailey, defense counsel questioned him regarding a "request for forfeiture" form that had printed at the top "a consent search was denied." [*Id.* at 37–39.] Sergeant Bailey clarified that, though Ross did deny him consent to perform a full search of his home, this occurred before the consent Ross granted Officer Szpila after he arrived on scene. [*Id.* at 56.] However, the warrant affidavit that Sergeant Bailey wrote out at the station immediately after leaving Ross and Ellis at the house with Officers Szpila and Jones makes no mention of any consent for Officer Szpila to enter Ross's home. [*See* DN 148-2 at 4 (Sergeant Bailey's Affidavit).] Instead, Sergeant Bailey wrote in the warrant affidavit that "Officers conducted a safety sweep of the residence to make sure no other suspects were present inside his home where officer could observe in plain view a baggie of Marijuana and a pile of cash on the kitchen table." [*Id.*] Moreover, in the report Sergeant Bailey wrote on October 29, 2014, the same day officers left Ross's house, he made no mention of the claim that Ross "consented to anyone entering at the time." [DN 167 at 62.] Rather, Sergeant Bailey stated in his report only that "Detective asked Ross for consent to search residence where he continued to act defensive and became belligerent." [*Id.* at 38.]

Finally, while both officers testified that Ross told them he had marijuana in his house, Ross testified that Sergeant Bailey "found the marijuana. I didn't tell him anything." [*Id.* at 100.] Rather, Ross stated that he "told him I smoked marijuana. I never told him there was marijuana inside my house." [*Id.* at 101.]

Police officers left Ross's house around 4:45 a.m. on the morning of October 29, 2014. [*Id.* at 49; 96–97.] Ross was not arrested, but was instead given a citation for possession of Marijuana. [*Id.* at 37; 40.] On January 28, 2015, Chief Judge Joseph H. McKinley, Jr. signed an order authorizing the interception of wire communications from "Target Telephone 2," a phone being used by Ross. [*See* DN 171-3 (Application for the Interception of Wire Communications).] On July 6, 2016, Ross was indicted on charges of conspiracy to possess with the intent to distribute heroin in violation of 21 U.S.C. §§ 841 and 846. [DN 112 (Indictment).] Later that same day, the LMPD obtained a search warrant for a house on Keeling Park Drive in Louisville, Kentucky, Ross's primary residence at the time. [*See* DN 171-4 (Search Warrant for Keeling Park Drive).]

In December 2016 and January 2017, Ross filed a motion to suppress and a supplemental brief in support of that motion. [DN 148; DN 160.] Therein, Ross alleges many grounds on which he argues evidence should be suppressed. First, Ross argues that the initial warrantless entry of his house on Southdale Road on October 28, 2014 was unlawful. [DN 148 at 2.] Second, Ross claims that the October 29, 2014 state search warrant was invalid because the warrant affidavit relied partly on information obtained during the alleged unlawful entry and because, without that information, the affidavit failed to establish probable cause. [*Id.* at 2–4.] Third, Ross asserts that certain statements he made to police were made without a valid waiver of his *Miranda* rights. [*Id.* at 3; DN 160 at 1.] Fourth, Ross contends that the federal wiretap warrants relied, in part, on the alleged unlawful search of Ross's residence on October 28, 2014, and that the warrants also failed to establish the requisite probable cause and necessity. [DN 148 at 4–7.] Fifth, Ross alleges that the July 6, 2016 state search warrant affidavit failed to establish probable cause to search his house on Keeling Park Drive. [DN 160 at 1–3.]

The Court held an evidentiary hearing on February 2, 2017, at which Sergeant Bailey, Officer Szpila, Ellis, and Ross all testified. [*See* DN 167.] Following the hearing, both parties filed simultaneous briefs, [DN 170; 171], and Ross filed a response brief, [DN 178.] Fully briefed, Ross's motion is now ripe for adjudication. For the reasons that follow, Ross's motion to suppress [DN 148] is **DENIED**.

## STANDARD

The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. If the government violates a defendant's Fourth Amendment rights, that defendant may move, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C), to exclude the evidence gathered against him. *United States v. Haygood*, 549 F.3d 1049, 1053 (6th Cir. 2008). It is well-settled that, in seeking suppression, "the burden of proof is upon the defendant" to show that the search or seizure violated "some constitutional or statutory right." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)). In resolving a motion to suppress, the evidence must be viewed in the light most favorable to the Government. *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013) (citing *United States v. Beauchamp*, 659 F.3d 560, 565 (6th Cir. 2011)).

## DISCUSSION

### 1) The Initial Entry and Subsequent Search Warrant for the Southdale Road House

Ross dedicates much of his motion to suppress and his post-hearing briefing on the argument that the officers' initial warrantless entry into his home on October 28, 2014, during which officers observed marijuana and a small amount of cash in Ross's kitchen, violated Ross's Fourth Amendment rights. [*See* DN 148; DN 170; DN 178.]

A "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 854 (6th Cir. 2012) (quoting *United States v. United States Dist. Ct.,* 407 U.S. 297, 313 (1972)). Accordingly, "searches and seizures inside a home without a warrant are presumptively unreasonable," *id.* (quoting *Groh v. Ramirez,* 540 U.S. 551, 559 (2004)), and therefore "a warrantless search or seizure inside a home by a law enforcement officer violates the Fourth Amendment unless an exception to the warrant requirement applies." *Id.* (citing *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006)).

The United States does not dispute that this initial entry in Ross's home was warrantless, but asserts that it was nonetheless constitutional. Specifically, the United States offers three justifications for the officers' initial warrantless entry into Ross's home on October 28, 2014. These are the exigent circumstances exception, consent, and the need to perform a protective sweep of Ross's home. [DN 171 at 8.] Indeed, each of these exceptions to the warrant requirement, if satisfied, can justify law enforcement's warrantless entry into a residence. *See United States v. Johnson*, 457 F. App'x 512, 516 (6th Cir. 2012) (discussing the exigent circumstances exception); *United States v. Holland*, 522 F. App'x 265, 273–76 (6th Cir. 2013) (discussing consent and the protective sweep doctrine).

Ross argues that none of these three exceptions is applicable here; specifically, he asserts that no exigent circumstances existed, that officers' contention that Ross gave them consent to enter is not credible, and that officers lacked sufficient articulable facts to justify entering Ross's home to perform a protective sweep. [DN 170 at 3–6.] However, the Court ultimately need not reach the issue of whether an exception to the warrant requirement applies here, because the United States also argues, and the Court agrees, that the affidavit in support of the search warrant

for Ross's home established probable cause *independent* of the information obtained during officers' initial entry into Ross's home. [*See* DN 171 at 17.]

The Warrant Clause of the Fourth Amendment guarantees that "no [w]arrants shall issue, but upon probable cause, . . . and particularly describing the place to be searched, and . . . things to be seized." U.S. Const. amend. IV. The test for probable cause is simply whether "there is a fair probability that [1] contraband or evidence of a crime [2] will be found in a particular place." *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The job of the judge "presented with a search warrant application is 'simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit,'" both propositions ring true. *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (alteration in original) (quoting *Gates*, 462 U.S. at 238). The duty of a reviewing court, in turn, is "to ensure that the [issuing judge] had a substantial basis for concluding that probable cause existed." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *Gates*, 462 U.S. at 238–39). In making that determination, the reviewing court is limited to examining the information contained within "the four corners of the affidavit." *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009) (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)).

If an affidavit in support of a search warrant relies in part on unconstitutionally obtained information, the "otherwise flawed warrant is still valid, 'if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause.'" *Young v. Owens*, 577 F. App'x 410, 415 (6th Cir. 2014) (quoting *United States v. Karo,* 468 U.S. 705, 719 (1984)). *See also Johnson*, 457 F. App'x at 517 ("We also determine that even if the initial protective sweep was unconstitutional and the observations obtained during that sweep were removed from the search

warrant, there was sufficient remaining evidence in the search warrant affidavit to support a finding of probable cause."); *United States v. Beasley*, 199 F. App'x 418, 423 (6th Cir. 2006) ("Even had the sweep not been justified, however, and even had the scales found during the sweep not been mentioned in Benton's affidavit, probable cause still supported the issuance of the search warrant that led to the discovery of additional incriminating evidence.").

Ross asserts that "[i]nformation gained from th[e alleged unlawful] sweep was then used in the affidavit to obtain a warrant," and therefore that the warrant was also invalid. [DN 178 at 2.] However, even if the Court assumes, for the sake of argument, that officers were not justified in entering Ross's home without a warrant on October 28, 2014, and therefore that portions of the warrant affidavit relied on unconstitutionally-obtained information, the Court nonetheless finds that sufficient "other facts existed in this case on which an adequate basis for finding probable cause could be established." *Young*, 577 F. App'x at 415. In other words, the facts included in the affidavit that were obtained prior to and independent of the initial entry were sufficient to establish probable cause on the face of the affidavit.

Here, Sergeant Bailey's affidavit, not including facts obtained during the initial entry, established probable cause to search Ross's house on Southdale Road. Sergeant Bailey is an officer with twenty-two years of law enforcement experience. [DN 171-2 at 4.] His affidavit recites that he was dispatched to Ross's house on October 28, 2014 in response to a panic alarm. [*Id.*] As Sergeant Bailey approached Ross on the front porch of his home, he immediately detected "a strong odor of [m]arijuana omitting from within the residence." [*Id.*] Sergeant Bailey wrote that the smell was of "fresh" marijuana rather than "a burnt smell commonly associated with one whom had just finished smoking [m]arijuana." [*Id.*] Further, Sergeant Bailey stated that Ross acted very nervous and defensive, and this defensive behavior increased after Sergeant

Bailey asked Ross about the marijuana smell. [*Id.*] After Sergeant Bailey placed Ross in handcuffs, Ross told Ellis to shut the door. [*Id.*] After Officer Szpila arrived, "Ross told detective he had a small amount of [m]arijuana on his kitchen table . . . and stated to detective that was the reason he was acting the way he was towards officer originally." [*Id.*] Finally, the affidavit described Ross's criminal history and the fact that Sergeant Bailey observed video surveillance cameras outside of Ross's home which, in his experience, are "commonly used in the drug culture to help dealers detect the presence of law enforcement." [*Id.* at 5.]

The Sixth Circuit has held that an affidavit establishes "a fair probability" that evidence of a crime will be found "where, for example, the affiant swears that he has seen marijuana seeds and smelled marijuana smoke inside the house to be searched." *United States v. Church*, 823 F.3d 351, 355 (6th Cir.), *cert. denied*, 137 S. Ct. 255 (2016) (citing *United States v. Brooks,* 594 F.3d 488, 494 (6th Cir. 2010); *United States v. Foster,* 376 F.3d 577, 588 (6th Cir. 2004)). Here, Sergeant Bailey averred that he smelled a strong odor of marijuana coming from Ross's house and that Ross admitted to the officers that he had a small amount of marijuana in his kitchen. [DN 171-2 at 4.] In other words, "the smell of marijuana here does not stand alone in the warrant affidavit, but is accompanied by" Ross's admission that he had some marijuana in his house. *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002).

Moreover, the Sixth Circuit has held that, although "nervousness alone is insufficient to establish probable cause," such "evasive behavior and nervousness may be considered as part of the probable cause analysis." *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012) (citing *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). And in this case, Sergeant Bailey's affidavit further stated that "Ross was acting extremely nervous" and that after Sergeant Bailey asked him about the smell of marijuana,

"Ross continued his suspicious behavior and became even more nervous and defensive with officer." [DN 171-2 at 4.] Finally, based on Sergeant Bailey's twenty-two years of experience, the existence of surveillance cameras attached to the outside of Ross's residence suggested to him the possibility of drug activity. [*Id.* at 5.]

The Court is satisfied that all of these facts included in the affidavit, when taken together, establish probable cause for the search of Ross's home. Accordingly, for the sake of judicial economy, the Court need not determine whether the initial warrantless entry was justified by an exception to the warrant requirement. *Cf. Phillips v. UAW Int'l, et. al.*, No. 16-1832, at *5 (6th Cir. April 12, 2017); *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009).

**2) Ross's Statements to Police**

Ross states in his motion that he seeks suppression of "all statements made . . . as a result of the searches made of Ross, his residence, and his telecommunication devices." [DN 148 at 1.] The only other time Ross mentions these statements in that motion is in characterizing his admission about marijuana in his kitchen as an "alleged (and unwarned) statement." [*Id.* at 3.] In his supplemental brief, Ross merely states that he "challenges the assertion that Mr. Ross made a valid waiver of his rights on October 28, 2014," but he does not elaborate on this argument. [DN 160 at 1.] Finally, in Ross's post-hearing briefing, he states that

> [d]espite the hours spent with Mr. Ross in handcuffs, the police did not obtain a written or recorded waiver of Ross's rights before questioning him at the scene. The police bear the burden of proving that Ross waived his rights. It is clear that Ross was angry at the police intrusion into his life that evening. He refused consent for a search. There is no reason to believe that he voluntarily waived any rights and there is no documentation that he did so.

[DN 170 at 6.] However, Ross did not offer any legal support for this argument in his briefing nor did he offer any testimony at the evidentiary hearing that he did not waive his *Miranda*

rights. [*See* DN 167.] Moreover, Ross has not identified *any* statements he allegedly made after the alleged *Miranda* waiver of which he seeks suppression.

It is well established in the Sixth Circuit that "'[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived,' and 'it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.'" *United States v. Brown*, 819 F.3d 800, 829 (6th Cir. 2016) (quoting *United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.1997); *United States v. Reed*, 167 F.3d 984, 993 (6th Cir.1999)) (alterations omitted). *See also United States v. Willoughby*, 742 F.3d 229, 234 (6th Cir. 2014) ("(Willoughby also suggests that the affidavit in support of the warrant was not properly sworn; but he does not develop that argument, so we do not consider it.)") Here, Ross has cited no legal authority in support of his arguments, and he did not develop this issue at the evidentiary hearing, aside from asking Sergeant Bailey to confirm that he did not obtain a written *Miranda* waiver form. [*See* DN 167 at 51–53.] Because Ross's argument "is perfunctory and unaccompanied by any legal support or developed argumentation . . . , we deem this argument waived" and find that Ross's statements should not be suppressed. *Brown*, 819 F.3d at 829.

### 3) The Title III Wiretap

On January 28, 2015, the United States obtained authorization for the interception of wire communications for "Target Telephone 2," one of two cell phones law enforcement believed Ross was using. [DN 171-3 at 6; 11; 16.] The other phone number police knew Ross to be using was the number Ross provided to the LMPD on the night they searched his residence on Southdale Road on October 28 and October 29, 2014. [*Id.* at 16.] The affidavit in support of the wiretap application was written by Brian D. Sanders, a Special Agent with the Drug Enforcement

Agency (DEA). [*Id.* at 10.] Therein, Special Agent Sanders identified the goals of the investigation as "identify[ing] all individuals and the scope of their respective activities within the 'Boonie'" drug trafficking organization (DTO). [*Id.* at 19.] Law enforcement believed "Boonie" to be the leader of a DTO in Louisville, Kentucky engaged in the distribution of heroin. [*Id.*] Officials sought to identify members of the DTO, identify their role in the operation, and to locate the source of supply of the illegal narcotics. [*Id.*]

At the time the application was filed, the DEA already had authorization to intercept wire communications over "Target Telephone 1," a phone being used by Boonie. [*Id.* at 19–20.] Interception of these communications was how law enforcement identified "'Boonie' as a high level narcotics trafficker" and determined that Ross was a member of his DTO. [*Id.*] The DEA believed that Boonie distributed heroin primarily to two individuals, Ross and Ronald Williams, each with "their own network of retail trafficker[s]. Therefore, the DEA believed that interception of communications over Target Telephone 2, which was used by Ross, would help identify other individuals involved in the DTO. [*Id.* at 20.]

Ross challenges the affidavit in support of the wiretap application in two ways. First, he argues that the affidavit relied on information obtained during the alleged unlawful entry into Ross's home on October 28, 2014. [DN 148 at 4.] Second, he contends that the affidavit failed to satisfy the probable cause and necessity requirements for Title III applications. [*Id.* at 4–7.] As the Court has already determined above that the October 29, 2014 search warrant for the Southdale Road house sufficiently set forth probable cause independent of information obtained during any alleged unlawful entry, the Court need only address the probable cause and necessity requirements.

"Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2522, governs the legal requirements for wiretaps." *United States v. Wright*, 635 F. App'x 162, 165–66 (6th Cir. 2015). The statute requires, in part, that applications for the interception of wire communications must establish that 1) "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;" 2) "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;" 3) "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;" and 4) "there is probable cause for belief that . . . the place where, the wire . . . communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person." 18 U.S.C. § 2518(3)(a)–(d).

An order authorizing the interception of wire communications shall not issue until a judge determines that the facts set forth in the application meet each of these requirements. *Id.* "When considering whether authorization of a wiretap was proper, we 'will accord great deference to the determinations of the issuing judge.'" *United States v. Jenkins*, 659 F. App'x 327, 330 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 700 (2017) (quoting *United States v. Corrado*, 227 F.3d 528, 529 (6th Cir. 2000)).

### a. Probable Cause

Ross first argues that the affidavit in support of the wiretap application did not establish probable cause that Ross was engaged in drug trafficking. [DN 148 at 4–7.] In detail, Ross states that "there were no controlled buys with Ross, no observation of Ross with any heroin, no observation of heroin transactions involving Ross, [and] no traffic stops uncovering heroin that

were tied to Ross." [*Id.* at 7.] According to Ross, the statements of confidential sources "that they 'knew' Ross to be a trafficker" were insufficient to satisfy the probable cause standard. [*Id.*] In response, the United States argues that the affidavit contained information from reliable confidential sources, corroborating facts from police, physical surveillance and GPS tracking by law enforcement, and wire interceptions of Target Telephone 1, all of which together more than established probable cause. [DN 171 at 18–22.]

"'The basic standards for a wiretap are similar to those for a search warrant,' and 'the question that must be decided in issuing a warrant is whether there is probable cause to believe that evidence of a crime will be uncovered.'" *Jenkins*, 659 F. App'x at 330 (quoting *United States v. Alfano*, 838 F.2d 158, 161–62 (6th Cir. 1988)). "Certainty is not required, but rather a fair probability and something more than mere suspicion." *Id.* (quoting *United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011)). As the Court noted above, a reviewing court will not reverse an issuing judge's probable cause determination "if the record contains a 'substantial basis for his probable cause findings.'" *Id.* (quoting *Alfano*, 838 F.2d at 162).

Here, Special Agent Sanders's affidavit established probable cause to believe that Ross was engaged in illegal drug trafficking and that a wiretap of Target Telephone 2 would lead to evidence that Ross and other then-unidentified individuals were involved in a DTO with Boonie to distribute heroin. The section of the affidavit setting forth probable cause for the issuance of authorization to perform wiretaps is extensive, spanning twenty-five pages. [DN 171-3 at 21–46.] It contains, in relevant part, information obtained from several confidential sources, surveillance conducted by law enforcement, GPS location tracking, the execution of administrative subpoenas, and interceptions of wire communications.

The first confidential source, CS1, provided information to agents about Ross's involvement in the suspected DTO. [*Id.* at 21.] Special Agent Sanders explained that CS1 had, for more than seven years, provided information to the DEA Louisville District Office (LDO) that "led to numerous monetary seizures and felony arrests." [*Id.*] CS1 "ha[d] a track record of unquestioned reliability." [*Id.*] In fall 2014, CS1 told the DEA LDO that, though CS1 had not had any direct interactions with Ross, CS1 had known of Ross for years and knew that he was currently involved in "receiv[ing] kilogram quantities of heroin from an individual known to [CS1] only as 'Boonie' . . ." [*Id.* at 22.] CS1 previously had a business relationship with Boonie involving the purchase of marijuana, but that relationship ended when Boonie became involved with other types of illegal drugs. [*Id.* at 23.] However, CS1 "remained close associates" with Boonie and saw him "socially on a regular basis." [*Id.*] CS1 told the DEA LDO that Boonie told CS1 that the heroin used in his operation was delivered to two different traffickers, one of whom was "lil Gary." [*Id.*] CS1 described "lil Gary's" car to DEA agents, and from that description agents determined that this individual was the Defendant, Gary Ross. [*Id.*]

CS2 was also "considered reliable and his/her information . . . led to multiple felony arrests and significant seizures of drugs and drug proceeds in the Louisville, Kentucky area." [*Id.*at 24.] CS2 told DEA agents that CS2 knew of Boonie as a trafficker of kilogram quantities of heroin and that Boonie distributed heroin to only two individuals, Ross and "Ron C." [*Id.*]

CS3 had also provided reliable information to the DEA LDO that has led to drug arrests and drug seizures in Louisville. [*Id.* at 25.] CS3 told agents that CS3 knew Ross to be a heroin trafficker in Louisville and knew that Ross recently had a large amount of money seized by law enforcement from his house. [*Id.*] Additionally, CS3 told agents that Ross "indicated to him/her that he had over a million dollars in cash in his possession" and that he "planned to have a player

from the National Basketball Association with whom he was friends claim ownership of the money in hopes that it would be returned to him from the police." [*Id.*]

CS5, another source who is considered reliable and who has provided information that has led to several arrests and drug seizures, provided information to LMPD detectives on December 18, 2014. [*Id.* at 38–39.] This information involved Ronald ("Ron C") Williams, the other individual to whom Boonie was suspected to distribute heroin. [*Id.* at 38.] CS5 listened to a recording of a call intercepted by the DEA LDO between a target individual, Coleman, and his source of heroin, who was an unidentified male. [*Id.* at 39.] CS5 unequivocally identified the voice of the unidentified male as Ronald Williams, whom CS5 had known for about twenty years. [*Id.*]

Special Agent Sanders additionally included information in his affidavit about the seizure of $157,408.00 from Ross on October 28 and 29, 2014 during the LMPD's search of Ross's house on Southdale Road. [*Id.* at 25–26.] At that time, Ross provided LMPD officers with his telephone number,[2] which a subsequent administrative subpoena confirmed was a number subscribed to Ross. [*Id.* at 26.] A November 24, 2014 administrative subpoena of the call records for Target Telephone 1 revealed that Ross attempted to contact Target Telephone 1 three times using this phone number on the morning of October 29, 2014, the day LMPD officers concluded the search of Ross's house. [*Id.*] That afternoon, Target Telephone 1 called Ross's number "on 4 occasions in quick succession and engaged in several brief telephone conversations." [*Id.*] Special Agent Sanders stated that he believed these conversations concerned the seizure of the $157,408.00, and that that money was likely drug proceeds from Ross's sale of the heroin provided to him by Boonie. [*Id.* at 26–27.]

---

[2] This telephone number is different than the number associated with Target Telephone 2, but is one of two phones law enforcement believed Ross to be using. [*See* DN 171-3 at 11; 26.]

On December 8, 2014, DEA LDO agents and LMPD officers attempted to locate and identify Boonie using GPS tracking of Target Telephone 1. [*Id.* at 27–28.] The agents and officers observed an unidentified black male matching CS1 and CS3's descriptions of Boonie and an unidentified female enter a Red Lobster restaurant in Louisville, Kentucky. Shortly after, agents and officers observed a burgundy Dodge Ram 1500, registered to Ross, arrive at the restaurant. [*Id.* at 28.] Ross and another unidentified black male exited the vehicle and entered the Red Lobster. [*Id.*] Around 8:15 p.m., law enforcement observed an unidentified Hispanic male arrive and enter the restaurant. [*Id.* at 28–29.] At around 9:00 p.m., officers and agents observed Ross, the Hispanic male, and three unidentified black males leave the Red Lobster and walk to the parking lot. [*Id.* at 29.] Two of the unidentified black males left in a blue Chevy Silverado, later determined to be registered to Williams's wife. [*Id.*] About twenty minutes later, agents and officers saw the unidentified male they suspected to be Boonie leave the restaurant along with two unidentified black females, one of whom was later identified as Ebony Burrus. [*Id.*]

On December 9, 2014, CS4 told detectives that "Ron. C" was waiting for a shipment of heroin to arrive from Boonie. [*Id.* at 31.] The next day, on December 10, CS4 stated that Ron C received the shipment and that it was selling for $3,500 per ounce. [*Id.*] Based on this information, Special Agent Sanders stated that he believed that the meeting between the Ross and the individuals suspected to be Boonie and Williams at Red Lobster concerned this incoming shipment of heroin. [*Id.* at 30–31.]

On December 11, 2014, CS1 told agents and officers that CS1 had been contacted by Boonie from Target Telephone 1. [*Id.* at 34.] Agents and officers corroborated this information by reviewing toll records obtained pursuant to an administrative subpoena. [*Id.*] CS1 and Boonie

met that evening, and GPS location data for Target Telephone 1 confirmed its location in the area CS1 stated that the meeting took place. [*Id.*] CS1 told officers and agents that CS1 and Boonie had a long conversation in which Boonie discussed his heroin operation and his concern that his associate, Ross, recently had about $150,000 seized from the LMPD. [*Id.* at 34–35.] CS1 told law enforcement that he/she believed that Ross owed that money to Boonie in exchange for heroin Boonie provided to Ross to sell. [*Id.* at 35.] CS1 further relayed to officers that Boonie expressed apprehension about continuing to sell heroin to Ross because Ross displayed a lot of wealth in the community. [*Id.*] CS1 additionally told officers that Boonie had two smartphones and one "burner" phone. [*Id.*]

On January 6, 2015, Target Telephone 2 was activated. [*Id.* at 41; 46.] At 1:07 p.m. that day, pursuant to a January 5, 2015 Title III wiretap warrant, DEA agents intercepted a call from Target Telephone 2 to Target Telephone 1, but the call was not answered. [*Id.* at 40.] Then, at 1:07 pm, DEA agents intercepted a call from Boonie using Target Telephone 1 to the other telephone number used by Ross, the number he provided to LMPD officers during the October 28 and 29 search of his house. [*Id.*] During the conversation, Ross asked Boonie "did you see the other one?", to which Boonie responded "yup . . . that was you?". [*Id.*] Then, Boonie told Ross "that he would get the 'other one' and call him shortly." [*Id.* at 41.] Based on this exchange, Special Agent Sanders stated that DEA agents believed that Boonie and Ross were afraid to speak using Target Telephone 1 and the number Ross had given to the LMPD, as the parties were likely worried that those numbers had been compromised. [*Id.* at 41–42.] Between January 6, 2015 and January 11, 2015, Target Telephone 2 called or received eight calls to or from another number law enforcement determined was being used by Boonie. [*Id.* at 46.]

Analysis of toll records for Target Telephone 2 indicated that it was being used by Ross. [*Id.* at 42.] For instance, "Target Telephone 2 [wa]s in regular contact with Ross's mother." [*Id.*] Moreover, through GPS tracking of Target Telephone 2, DEA agents found that Target Telephone 2 was "regularly in the vicinity of Ross's residence [on] . . . Southdale Road" and "that the phone stays in the same location overnight." [*Id.* at 42–43.]

Finally, the affidavit contained information regarding Ross's criminal history, which included, among other things, convictions of possession and trafficking of controlled substances. [*Id.* at 16–17.]

Based on all of this information, Special Agent Sanders's affidavit provided ample information for Chief Judge McKinley to find probable cause that Target Telephone 2 was being used by Ross in furtherance of a conspiracy to distribute heroin and that communications concerning those crimes would be obtained through interception of communications from Target Telephone 2. *See* 18 U.S.C. § 2518(3)(a)–(d). The main argument Ross makes to the contrary is that nowhere in Special Agent Sanders's affidavit does he state that law enforcement made controlled buys with Ross or ever observed him with heroin or engaged in drug transactions.[3] [DN 148 at 7.]

However, what Ross does not discuss is the information that *was* contained in the affidavit. Here, CS1 and CS2 both identified Boonie and Ross as heroin traffickers and told law enforcement that Boonie distributed heroin primarily to two individuals, Ross and Williams. [DN 171-3 at 21–24.] CS3 also identified Ross as a heroin trafficker, was aware that Ross had a large sum of money seized by the LMPD, and indicated that Ross still had over a million dollars in his

---

[3] Ross also briefly states in his motion that CS4 "was not stated to be reliable or to have any particular track record or history as an informant," as were CS1, CS2, CS3, and CS5. [*Id.* at 6.] However, because the Court finds that the information from the remaining confidential sources, together with information obtained from police surveillance, tracking, administrative subpoenas, and wire interceptions was sufficient to establish probable cause without the information provided by CS4, the Court need not reach the issue of whether CS4 was sufficiently reliable.

possession. [*Id.* at 25.] The affidavit further discussed the $157,408.00 that the LMPD seized from Ross on October 29, 2014 and stated that toll records from later that day showed that Ross had several calls to and from Target Telephone 1, which law enforcement knew to be used by Boonie. [*Id.* at 25–27.] Calls intercepted between Target Telephone 1 and Ross during which the parties discussed the "other ones" further led law enforcement to believe that Ross and Boonie both used multiple phones. [*Id.* at 41–42.]

Moreover, CS1 eventually had a meeting with Boonie, during which Boonie discussed his heroin DTO, the seizure of $157,408.00 from Ross, and concerns over continuing to distribute to Ross. [*Id.* at 34–35.] Finally, after Target Telephone 2 was activated, told records revealed that it was in contact with Target Telephone 1 and another number officers knew to be used by Boonie. [*Id.* at 40; 46.] Target Telephone 1 was also in frequent contact with Ross at the telephone number he provided to police during the October 28 and 29 search of his house. [*Id.* at 40–41.] In total, this information gave rise to a fair probability that Ross was engaged in heroin trafficking and that evidence of a heroin trafficking operation would be intercepted through wiretaps of Target Telephone 2. Accordingly, Chief Judge McKinley had a substantial basis for finding probable cause on the face of the affidavit.

### b. Necessity

Ross next challenges the wiretap application on the grounds that it did not sufficiently set forth the necessity of the interception of Ross's wire communications. Specifically, Ross argues that, because no one had personally observed Ross with drugs or engaged in drug transactions, the investigation was as a mere "starting point," which is an inappropriate time to engage in wiretapping. [DN 148 at 7.] In response, the United States argues Special Agent Sanders's affidavit extensively outlined the alternative methods of investigation that were either used or

considered by the DEA before applying for wiretap authorization and therefore that the affidavit sufficiently demonstrated the necessity of wiretapping as the next step in the investigation. [DN 171 at 22–24.]

The statute requires that wiretap applications include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," and an issuing judge may only authorize interception after finding that this requirement is met. 18 U.S.C. § 2518(1)(c), (3)(c). The purpose of the necessity requirement is to "protect[] against the impermissible use of a wiretap as the 'initial step in [a] criminal investigation.'" *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007) (quoting *United States v. Giordano,* 416 U.S. 505, 515 (1974)). Specifically, the "requirement is designed 'to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime' . . ." *Wright*, 635 F. App'x at 166 (quoting *United States v. Landmesser,* 553 F.2d 17, 19–20 (6th Cir. 1977)). "However, investigators need only 'give serious consideration to the non-wiretap techniques prior to applying for wiretap authority,' and explain to the court 'the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.'" *Jenkins*, 659 F. App'x at 333 (quoting *United States v. Giacalone*, 853 F.2d 470, 480 (6th Cir. 1988); *Alfano*, 838 F.2d at 163–64). Moreover, "a district court's finding that the requirements of § 2518(1)(c) have been met are afforded 'considerable discretion.'" *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (quoting *Landmesser,* 553 F.2d at 20).

Here, Special Agent Sanders's affidavit sufficiently explains the necessity of the wiretap on Ross's phone and sufficiently describes the alternate investigative techniques that were "tried and failed," "appear[ed] to be unlikely to succeed if they [we]re tried," or that were "too

dangerous to employ." [DN 171-3 at 46–64.]   First, Special Agent Sanders opined that the interception of wire communications was "the only available technique that ha[d] a reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt" that the suspected individuals were engaged in the suspected criminal activity." [*Id.* at 46.] Special Agent Sanders explained that officers had, up to that point, been unable to establish the identity of Boonie, the suspected leader of the DTO, unable to identify Boonie's suppliers or other co-conspirators such as customers and distributors. [*Id.*] *Cf. Stewart*, 306 F.3d at 305 ("[L]aw enforcement officials alleged that wiretap surveillance was the only investigative technique reasonably likely to establish the full scope of the alleged criminal enterprise.")

Second, to support this claim of necessity, Special Agent Sanders explained, in great detail, why certain other investigative techniques were ineffective, too risky, had only limited success, or were unlikely to fully accomplish the goals of the investigation. These alternative techniques included the use of 1) undercover agents and confidential sources; 2) physical surveillance; 3) pole cameras or close circuit TV; 4) pen registers, traps and traces, or toll analysis; 5) search warrants; 6) tracking devices; 7) trash searches; 8) financial investigation; 9) interception of wire communications; 10) administrative subpoenas; 11) grand jury subpoenas; and 12) interviews of investigative targets and associates. [*Id.* at 47–64.]

For example, according to Special Agent Sanders, while confidential sources had been useful to a certain extent, because Boonie would only deal with certain individuals whom he trusted, none of the confidential sources were able to infiltrate the organization. [*Id.* at 47–48.] Other confidential sources were also not in a position to purchase illegal drugs from members of the DTO. [*Id.* at 48–49.] Nor did Special Agent Sanders believe it was likely that any undercover law enforcement agents would have success infiltrating the DTO due to the exclusiveness of

dealings within the DTO and the tendency to compartmentalize drug activities to minimize the possibility of detection. [*Id.* at 49–50.] With regard to physical surveillance and location data, Special Agent Sanders explained that these tools had been useful for purposes of observing Boonie and other members of the DTO and identifying places at which drug activity likely occurred. [*Id.* at 50–51.] However, greater surveillance could have created the risk of detection and still would not have allowed law enforcement to determine whether individuals "utilize[d] the[e] residence to accept payment of drug debts, to distribute quantities of illegal drugs, or the storage of large quantities of heroin or drug proceeds." [*Id.* at 52.] In other words, "surveillance observations by themselves are generally insufficient to prove the purpose of the meetings and other activities." Moreover, surveillance was unlikely to establish the identity of other individuals involved in the DTO, a key goal of the investigation. [*Id.* at 53.]

Special Agent Sanders additionally explained why the use of pole cameras or close circuit TV would provide little insight into the DTO, [*id.* at 54], and that toll records "provide[d] only investigative leads and corroborating evidence, but d[id] not in themselves provide any direct evidence of criminal activity." [*Id.* at 55.] Moreover, the use of search warrants was not a viable option, as law enforcement was unaware of any locations (aside from the Southdale Road house, which had already been searched), at which the DTO conducted drug activity. [*Id.* at 57.] Though law enforcement had used tracking devices with some success and planned to continue using them, Special Agent Sanders opined that it was necessary to intercept wire communications to ascertain "the exact purpose for any location tracked." [*Id.* at 59.] Trash searches were also not a feasible option because the only house law enforcement knew to be associated with the DTO, the Southdale Road house, had surveillance cameras installed on the exterior which would allow occupants to detect law enforcement. [*Id.* at 60.]

Special Agent Sanders also explained that the interception of wire communications from Target Telephone 1 had been useful in allowing law enforcement to establish that Boonie communicated with various associates, including Ross. [*Id.* at 61–62.] However, Special Agent Sanders believed that Boonie would soon discontinue use of Target Telephone 1, making interception of communications from Target Telephone 2 necessary. [*Id.* at 62.] While administrative subpoenas had been useful in identifying "Target Interceptees" and the existence of Target Telephone 2, these tools still could not allow law enforcement to determine "the substance of the conversations . . . or any certainty as to the exact identities of the actual conversants." [*Id.* at 62.] Finally, Special Agent Sanders opined that the use of grand jury subpoenas or interviews of investigative targets and associates would not be successful because they could be barred by claims immunity, could lead to false information, and could notify participants of the DTO as to the existence of the investigation. [*Id.* at 63–64.]

In sum, Special Agent Sanders exhaustively explained in his affidavit that "investigators [had] give[n] serious consideration to the non-wiretap techniques prior to applying for wiretap authority" and sufficiently explained "the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Wright*, 635 F. App'x at 166 (citing *Alfano,* 838 F.2d at 163–64). Importantly, "[t]he government 'need not prove the impossibility of other means of obtaining information,' as 'the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance.'" *Id.* at 166 (citing *Stewart*, 306 F.3d at 305). Moreover, "[w]here, as here, 'the telephone is routinely relied on to conduct the criminal enterprise under investigation,' a wiretap 'is particularly appropriate.'" *Jenkins*, 659 F. App'x at 335 (quoting *Landmesser*, 553 F.2d at 20). Accordingly, the Court finds that Special Agent Sanders' affidavit established the

probable cause and necessity required under § 2518 for the issuance of authorization to intercept wire communications.

### 4) Search Warrant for the Keeling Park Drive House

Finally, Ross alleges that the July 6, 2016 search warrant failed to establish probable cause that evidence of a crime would be found at Ross's residence on Keeling Park Drive. [DN 160 at 1–3.] Detective Daniel Evans of the LMPD wrote the affidavit in support of this search warrant. [DN 171-4 at 1 (Detective Evans's Affidavit).] At that time, Detective Evans had been employed by the LMPD for ten years. [*Id.* at 2.] In his affidavit, he explained that, based on the DEA's 2015 interception of wire communications from Boonie, who was eventually identified as Martin Polk, a heroin trafficker, "[i]t was determined that P[olk] primarily distributes the heroin to Gary R[oss] and Ronald W[illiams]." [*Id.*] Pursuant to a series of search warrants executed in March 2015, DEA agents seized approximately $285,000 and five kilograms of heroin and obtained enough information to secure the indictments of Polk, Williams, and other members of the DTO. [*Id.*]

In August and September 2015, confidential informants engaged in communications with an individual named Darin Harris for the purpose of organizing a controlled drug transaction. [*Id.*] On August 19, 2015, confidential informants had a meeting with Harris, who informed the confidential informants that he did not have enough money to purchase heroin at that time, but that "his 'partner' had the money." [*Id.*] Though Harris did not name Ross by name, police surveillance of Harris immediately following this meeting showed him meeting with Ross. [*Id.*] Harris indicated to the confidential informants that he and a "third-party buyer" sought to purchase three kilograms of heroin for $72,000 per kilogram, for a total of approximately $215,000. [*Id.*] On September 23, 2015, the confidential informants told Harris to have the

money ready the following morning. [*Id.*] After this conversation, GPS tracking of Harris' cell phone showed him travel to the house on Keeling Park Drive, Ross's primary residence at that time. [*Id.*] Harris remained there for several hours. [*Id.*] Detective Evans stated in the affidavit that the LMPD believed Harris travelled to Ross's residence that day "to count and prepare the money for the transaction." [*Id.*]

On September 24, 2015, the confidential informants told Harris they wanted to meet he and his "partner." [*Id.* at 3.] Immediately after, location tracking data showed Harris leave his residence and travel directly to Ross's house on Keeling Park Drive. [*Id.*] After Harris arrived at Ross's house, Harris contacted the confidential "informants to negotiate the drug transaction." [*Id.*] Detective Evans stated that, based on his training and experience, he believed that Harris and Ross were counting large sums of money to prepare to carry out the transaction. [*Id.*] However, negotiations over money ultimately failed and the transaction was not carried out. [*Id.*]

The affidavit included additional evidence regarding Ross's criminal history, including previous charges of narcotics trafficking, and the October 2014 seizure of roughly $150,000 from Ross's previous residence on Southdale Road. [*Id.*] Jefferson County property records showed that Ross owned the Keeling Park Drive house. [*Id.*] And, like Ross's previous residence, the Keeling Park Drive house was equipped with surveillance cameras on the outside. [*Id.*] Finally, Ross was indicted for heroin trafficking the same day Detective Evans applied for the search warrant, on July 6, 2016. [*Id.*] An arrest warrant issued that same day. [*Id.*]

Ross does not raise issues with the fact that some information contained in the affidavit was obtained from confidential informants who interacted with Harris. [*See* DN 160.] Rather, he alleges that the affidavit in support of the warrant contained conclusory statements and lacked evidence to "directly connect[] Ross to drug trafficking." [*Id.* at 1–2.] Specifically, Ross argues

that the statement that the January 2015 investigation showed that "Polk primarily distributes heroin to Gary Ross and Ronald Williams" was not sufficiently developed for the issuing judge to evaluate. [*Id.* (citing DN 171-4 at 2).] Additionally, Ross states that "[n]o one alleges to have seen drugs at Ross's residence, to have seen Ross with drugs, or to have observed a drug transaction involving Ross. No seized drugs have been connected to Ross." [*Id.*]

As the Court stated above, to find probable cause, it must simply be that, based on the four corners of the affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Slaughter*, 274 F. App'x 460, 465 (6th Cir. 2008) (citations omitted). Whether this standard is met is determined based on the "totality of the circumstances." *Brooks*, 594 F.3d at 492 (citations omitted.) Moreover, as the Court noted above, "[t]he magistrate's determination of probable cause is afforded great deference and should be reversed only if arbitrarily made." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (citing *United States v. Allen,* 211 F.3d 970, 973 (6th Cir. 2000) (en banc)).

As the United States argues in its post-hearing brief, the Sixth Circuit has "acknowledged that '[i]n the case of drug dealers, evidence is likely to be found where the dealers live.'" *Brown*, 828 F.3d at 383 (quoting *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998)). And while an individual's status as a drug dealer alone will not suffice for a finding of probable cause that drugs or drug proceeds will be found in his home, "reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence" ordinarily will. *Id.* For example, "facts showing that the residence had been used in drug trafficking" are typically sufficient. *Id. See also Berry*, 565 F.3d at 339 ("Although a defendant's status as a drug dealer, standing alone, does not give rise to a fair probability that drugs will be found in defendant's home . . . that status . . . plus

observation of drug activity near defendant's home is sufficient to establish probable cause to search the home.")

Here, the affidavit established that Ross was a known drug trafficker based on the 1) DEA LDO's investigation into Boonie's (later identified as Polk's) heroin trafficking operation, 2) the LMPD's October 2014 seizure of about $150,000 from Ross's previous residence on Southdale Road, and 3) Ross's prior criminal history involving narcotics trafficking. [DN 171-4 at 2–3.] Ross suggests that the statement in the affidavit that DEA agents "determined that P[olk] primarily distributes the heroin to Gary R[oss] and Ronald W[illiams]" was not sufficiently developed for the issuing judge to evaluate. [DN 160 at 1–2 (citing DN 171-4 at 2).] After reviewing the affidavit, however, the Court disagrees. Rather, Detective Evans provided detailed information explaining how DEA agents made this determination. He stated in the affidavit that, beginning in January 2015, the DEA obtained authorization to perform wiretaps of a phone used by Polk, a "kilogram quantity heroin trafficker." [DN 171-4 at 2.] Through several interceptions, "over numerous phones utilized by P[olk] and members of his" DTO, DEA agents were able to ascertain Polk's role in the DTO and identify the individuals to whom Polk distributes, including Ross and Williams. [*Id.*] This was sufficient detail about the DEA investigation for the issuing judge to make a determination as to probable cause for the July 6, 2016 search warrant.

And although Ross is correct that the affidavit did not contain explicit observations of Ross with drugs or engaged in drug transactions, it nonetheless contained several facts that suggested that drug activity was occurring at Ross's house. Specifically, confidential informants were engaged in frequent communications with Harris in August and September 2015 for the purpose of arranging a heroin sale. Three times after speaking with the informants, Harris

travelled immediately to Ross's residence at Keeling Park Drive. The fact that Harris repeatedly visited Ross's house in the midst of negotiating a nearly $215,000 drug transaction with the informants suggests the ongoing nature of the criminal activity and that criminal activity was taking place at Ross's house. For instance, the fact that Harris went straight to Ross's house on September 23 immediately after informants told Harris to have the money ready the following morning and on September 24 after informants told Harris they wanted to meet his partner, and remained at Ross's residence for several hours each time, suggests that Harris and Ross were working together to gather the money to purchase the heroin. This is ample evidence that Ross's residence was "be[ing] used in drug trafficking" and therefore "connect[s] [Ross]'s ongoing criminal activity to the residence." *Brown*, 828 F.3d 383. Accordingly, the Court finds that Detective Evans's affidavit established a substantial basis for the state court judge to find probable cause to search Ross's house on Keeling Park Drive.

CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** that Gary Ross's Motion to Suppress [DN 148] is **DENIED**.


Date:

cc:      Counsel of Record